TRINA A. HIGGINS, United States Attorney (7349)
TRAVIS K. ELDER, Assistant United States Attorney (11987)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
(801) 524-5682
travis.elder@usdoj.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>REAL PROPERTY LOCATED AT 2216 CAMDEN CREEK LANE, HOUSTON, TEXAS,<br><br>Defendant in Rem. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM***<br><br>Case No. 2:23-cv-919<br><br>Judge |

Pursuant to Supplemental Rule G(2) of the Federal Rules of Civil Procedure, the United States of America alleges this *in rem* complaint for forfeiture against Real Property Located at 2216 Camden Creek, Houston, Texas (Defendant Property):

### NATURE OF THE ACTION

1. This civil forfeiture action arises from an elaborate scheme to launder the proceeds of multiple frauds and funds involved in illegal structuring through a $1.78 million cash purchase of a luxury residence in Houston, Texas. Through 44 apparently coordinated payments by wires, checks, and cashier's checks from more than 30 different payers to a home builder, the perpetrators attempted to cleanse and legitimize their ill-gotten gains. The perpetrators concealed and disguised funds traceable to at least 16 victims from across the United States and one in

Canada by layering them through numerous bank accounts including multiple accounts in the names of shell businesses.

2.      The forfeiture of the Defendant Property is authorized by:

    a.   18 U.S.C. § 981(a)(l)(C) because it is property, real or personal, that constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1343, or a conspiracy to commit the same in violation of 18 U.S.C. § 1349;

    b.   18 U.S.C. § 981(a)(1)(A) because it is property, real or personal, involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956, or property traceable to such property; and

    c.   31 U.S.C. § 5317(c)(2) because it is traceable to property 1) involved in violations of 31 U.S.C. § 5324(a)(3), which makes it an offense to structure currency transactions with a domestic financial institution for the purpose of evading the reporting requirements of 31 U.S.C. § 5313 and its accompanying regulations; and 2) involved in violations of 31 U.S.C. § 5324(a)(1), which makes it an offense to cause a domestic financial institution to fail to file a report required by 31 U.S.C. § 5313 and its accompanying regulations.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1345 and 1355(a), and in rem jurisdiction is proper under 28 U.S.C. § 1355(b).

4.      Venue in this Court is proper under 28 U.S.C. § 1355(b)(1)(A) and 18 U.S.C. § 981(h), because acts or omissions giving rise to the forfeiture occurred in the District of Utah and because *United States v. Onoriode Kenneth Adigbolo*, No. 2:19-cr-00190-CW, is a

prosecution in the District of Utah that involves a defendant charged with a violation that is the basis for the forfeiture of property in this case.

## PARTIES

5.      The plaintiff is the United States of America.

6.      The Defendant Property is Real Property Located at 2216 Camden Creek, Houston, Texas 77077 and legally described as Lot 2, Block 3, The Parkway at Eldridge, Section 1, Harris County, Texas.

7.      The Defendant Property has not been seized. The United States does not presently request authority from the Court to seize the Defendant Property. The United States will, as provided by 18 U.S.C. §§ 985(b)(1) and (c)(1):

    a.  Post notice of the action and a copy of the Complaint on the Defendant Property;

    b.  Serve notice of this action on the titled owner of the Defendant Property, Obianuju Geraldine Ononiba (Ononiba), along with a copy of the Complaint; and

    c.  File a lis pendens in the real property records of Harris County, Texas that gives notice of the Defendant Property's status as a defendant in this matter.

8.      Obianuju was born in about 1973.

## FACTS

### A. *The Subject Property is subject to forfeiture because the 44 payments made for its construction and purchase trace to fraud, structuring, and money laundering.*

9.      Ononiba is the titled owner of the Defendant Property pursuant to a general warranty deed dated July 15, 2020, and recorded in the records of the County Clerk of Harris County, Texas on that same date.

10.      Ononiba purchased the property as a new construction from the builder, Kickerillo Company, Inc. (Kickerillo).

11.      On February 4, 2019, Ononiba agreed with Kickerillo in an earnest-money contract to purchase the Defendant Property for $1,650,000. According to a schedule attached to the agreement, a $10,000 initial deposit was received. The $10,000 initial deposit included a $6,000 deposit on December 13, 2018, and $4,000 deposit on December 14, 2018. Additional payments were to include: 1) $155,000 by March 21, 2019; 2) $165,000 by May 4, 2019; 3) $1,320,000 at the May 4, 2020 closing.

12.      Extras added after the contract increased the purchase price.

13.      Between December 13, 2018, and July 9, 2020, Kickerillo received 44 payments totaling $1,778,412.43 toward the purchase price of the Defendant Property (Kickerillo Payments) as listed in Attachment A, which is incorporated herein by this reference.[1]

14.      The funds used to purchase the Defendant Property trace to at least fifteen individual victims of fraud and one business victim of fraud whose combined total losses exceed

---

[1]   Bank account references will include the bank name followed by the last four digits of the account number.

three million. The victims resided in Canada and in eleven states including: Arizona, California, Florida, Maryland, Nebraska, New York, Ohio, Pennsylvania, Texas, Virginia, and Washington.

15.     None of the victims were told or were otherwise aware that any portion of their money was being used to construct and purchase a luxury residence in Houston, Texas for Ononiba. If they had known this, none of them would have given their money to those who fraudulently obtained it from them. None of the victims knew or had any knowledge about Ononiba.

16.     Twenty-six of the Kickerillo Payments trace to fifteen different business entities located in Nigeria and six states including Texas, New Jersey, Georgia, Utah, Alabama, Louisiana.

17.     Eight of the Kickerillo Payments trace to banks based in Africa.

18.     The entire Defendant Property is subject to forfeiture because:

   a.   Fifteen of the Kickerillo Payments totaling $782,519.68 (plus any attributable appreciation) trace to fraudulently obtained funds or to persons or entities involved in perpetrating fraud.

   b.   Five of the Kickerillo Payments totaling $130,000 (plus any attributable appreciation) trace to funds involved in illegal structuring.

   c.   Twenty-four of the Kickerillo Payments totaling $995,892.75 (plus any attributable appreciation) are other funds involved in money laundering.

   d.   All the Kickerillo Payments totaling $1,778,412.43 (plus any attributable appreciation) used to purchase and construct the Defendant Property are property involved in money laundering.

**B. Fifteen Kickerillo Payments totaling $782,519.68 trace to fraudulently obtained funds or to persons or entities involved in perpetrating fraud.**

19.     The fifteen Kickerillo Payments totaling $782,519.68 can be sub-divided into payments traceable to four categories of illegal conduct: 1) a romance scam conspiracy perpetrated by Onoriode Kenneth Adigbolo (Adigbolo) and others (three payments); 2) other romance-type scams and a medical billing fraud (eight payments); 3) advance-pay fraud schemes involving Vic & Lenny LLC (two payments); and 4) Paycheck Protection Program (PPP) loan fraud and potential Economic Injury Disaster Loan (EIDL) loan fraud (two payments).

20.     Eleven of the Kickerillo Payments trace to romance scams or "confidence scams." Romance scams involve perpetrators creating fictitious profiles on social websites such online dating websites, gaining the trust of potential victims, and then deceiving victims into transferring and receiving money under false pretenses.

21.     Not all romance scams involve romantic relationships. Some of these scams involve the fraudster developing a platonic relationship with the victim. After a close friendship has been established, the fraudster will ask for money to help with an urgent fabricated circumstance such as a made-up familial emergency. Once the money is sent, the victim usually never hears from the fraudster again.

**1. Three Kickerillo Payments totaling $76,951.68 trace to romance scams perpetrated by a conspiracy involving Adigbolo.**

22.     Three Kickerillo Payments trace to a romance scam perpetrated by Adigbolo, Oghenetega Emuveyan (Oghenetega), Ruzanna Emuveyan (Ruzanna), Jimmy Chiejine Iwezu (Iwezu), ETR Services, LLC (ETR), and RBE Solutions LLC (RBE).

6

### a) The $36,981.34 wired to Kickerillo on May 29, 2019, traces to romance scam victims VICTIM 1 and VICTIM 2.

23.     The $36,981.34 wire from ETR's Bank of America 1639 to Kickerillo on May 29, 2019, traces to money obtained by false pretenses from VICTIM 1 and VICTIM 2, victims of romance fraud schemes who respectively lost approximately $157,000 and $300,000.

24.     In February 2019, VICTIM 1 met "Allen Hein Sang" (Sang) through EastMeetEast, an online dating site focused on the Asian culture. VICTIM 1 is a pharmacist in Washington and the daughter of Chinese immigrants. Sang represented himself as a business owner living in Los Angeles, California. To assuage VICTIM 1's suspicions about being targeted by a scammer, Sang sent VICTIM 1 a photo of a California driver's license issued in Sang's name. After a few weeks of online and phone communications, Sang began telling VICTIM 1 that he loved her and planned to marry her.

25.     Sang persuaded VICTIM 1 to invest in his company with the promise that VICTIM 1 would be paid back. To assure VICTIM 1 that it was a legitimate business deal, Sang sent her several contract agreements, receipts, and identification cards that appeared legitimate, but were false. Sang convinced VICTIM 1 to obtain seven bank loans and to borrow money from her parents.

26.     Based on Sang's false or fraudulent representations and promises, between March and May 2019, VICTIM 1 wired approximately $157,000 in multiple outgoing wires to various persons, according to Sang's instructions.

27.     On May 22, 2019, as Sang directed, VICTIM 1 wired $5,000 from her bank account in Washington to ETR's Bank of America 1639 in Utah.

28.     ETR was a domestic limited liability company registered in Utah on or about October 13, 2016. ETR was dissolved on or about January 27, 2021. ETR's manager was Ruzanna. ETR's registered agent was Oghenetega. ETR's registered address was in Saratoga Springs, Utah.

29.     On May 24, 2019, VICTIM 1 additionally wired $15,000 from her bank account in Washington to ETR's Bank of America 1639 in Utah.

30.     VICTIM 2 met "Gary Wong" (Wong) through an online dating site in 2019. VICTIM 2 is a lawful permanent resident from Taiwan living in New York who works for a pharmaceutical company. Wong told VICTIM 2 he was in the U.S. Army and worked overseas on a United Nations detail assignment.

31.     Wong told VICTIM 2 he wanted to return to the United States but couldn't because the identifying documents he needed to enter the United States were in a package being held by customs in the United Kingdom. Wong claimed that he needed to hire a special courier to retrieve the package. However, Wong said he could not hire the special courier himself because his identifying documents were in the "stuck" package. Wong promised VICTIM 2 that if she paid the special courier fee, he could retrieve the package and would pay her back when he arrived in the United States.

32.     Based on Wong's false or fraudulent representations and promises, VICTIM 2 agreed to pay the special courier fees. Using all her savings and a loan from her parents, VICTIM 2 transferred approximately $300,000 according to Wong's instruction.

33.     On May 28, 2019, VICTIM 2 wired $78,000 from VICTIM 2's bank account in New York to ETR's Bank of America 1639 in Utah.

8

34.     On May 29, 2019, ETR's Bank of America 1639 in Utah wired $36,981.34 to Kickerillo's account in Texas for the purchase of the Defendant Property. This wire included funds traceable to VICTIM 1's wires to ETR on May 22nd and 24th and VICTIM 2's wire to ETR on May 28th.

35.     Oghenetega and Ruzanna, the signatories on ETR's Bank of America 1639, admitted using the account to transfer money from illicit sources including the $36,981 wire to Kickerillo on May 29, 2019. According to Oghenetega and Ruzanna, Adigbolo directed the movement of illicit funds in and out of the account and it was Adigbolo who instructed them to wire the money to Kickerillo.

36.     In 2021, Adigbolo pled guilty to Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. 1956(a)(2)(B)(i) and (h). In a Statement in Advance of Plea, he admitted:

> From approximately May 1, 2016, to June 4, 2019, I, along with JEFFERSONKING ANYANWU, CHUKWUDI KINGSLEY KALU, DAVID MADUAGU, RICHARD BASSEY UKOREBI, GODSENT NWANGANGA, ADRIANNA CRUZ SOTELO, and others, agreed to launder the proceeds of bank fraud and mail fraud by moving or attempting to move the proceeds from a place in the United States to Nigeria, knowing that the transfers would be designed in whole or in part to conceal or disguise the nature, location, source, ownership, and control of the proceeds. I knew the essential objective of the conspiracy (to launder proceeds of the criminal activity) and knowingly and voluntarily involved myself in the conspiracy. In addition, there was interdependence among members of the money laundering conspiracy as we worked together to open accounts and provide them and our addresses to our overseas coconspirators and to launder the proceeds of bank fraud and mail fraud. My coconspirators and I further participated in the underlying mail fraud by providing mailing addresses to our coconspirators and receiving from the mail cash, checks, and money orders sent by fraud victims. On or about March 22, 2019, in furtherance of the fraudulent scheme, ADIGBOLO received and removed from the mail a package addressed to "Raymond Maxwell" containing approximately $97,000 in cash sent by a victim of the fraudulent scheme. In total, while I was participating in the conspiracy laundered, we conducted approximately $7,267,847.26 in money laundering transactions through our accounts using proceeds of fraud.

Based on this plea, Adigbolo was convicted on April 18, 2022.

37.     Oghenetega pled guilty to Money Laundering Conspiracy in violation of 18

U.S.C. § 1956(h) in *United States v. Oghenetega Benson Emuveyan*, 2:20-cr-00286-DBB. In a

Statement in Advance of Plea, he admitted:

> The following took place while I was in the District of Utah. Beginning on or
> before May 9, 2019 I agreed with others (implicitly or explicitly) to receive and
> launder the proceeds of romance scams, including by engaging in interstate wire
> transactions exceeding $10,000 involving the proceeds of those romance scams
> that are wire fraud violations of 18 U.S.C. § 1343. My participation in the
> conspiracy continued through June 18, 2019. I used bank accounts opened in the
> name RBE Solutions LLC and ETR Services LLC, entities formed by me and my
> wife, to receive and remit money on behalf of others in exchange for a fee. I
> knowingly and voluntarily entered into the conspiracy understanding its objective
> was to launder money. My coconspirators and I depended upon each other to
> direct and receive and redirect the funds from the victims through multiple layers
> of accounts.

Based on this plea, Oghenetega was convicted on April 21, 2022.

38.     Ruzanna pled guilty to Conducting an Unlicensed Money Transmitting Business

in violation of 18 U.S.C. § 1960 in *United States v. Oghenetega Benson Emuveyan and Ruzanna*

*Mogeul Emuveyan*, 2:20-cr-00286-DBB. In a Statement in Advance of Plea, she admitted:

> Beginning on or about May 9, 2019 and continuing through June 18, 2019, while
> in the District of Utah, I used bank accounts opened in the name RBE Solutions
> LLC and ETR Services LLC, entities formed by me and my husband, to receive
> and remit money on behalf of others in exchange for a fee. Neither the entities,
> my husband, nor I were licensed to operate a money transmitting business as
> required by the laws of the State of Utah, nor were we registered as required by
> section 5330 of the Title 31, United States Code. The State of Utah makes it a
> misdemeanor to operate a money transmitting business without a license under
> Sections 7-25-201 and 7-25-405 of the Utah Code.

Based on this plea, Ruzanna was convicted on April 21, 2022.

39.     ETR was convicted on April 22, 2022, in the District of Utah of Conducting an

Unlicensed Money Transmitting Business in violation of 18 U.S.C. § 1960 in *United States v.*

*ETR Services, LLC*, No. 2:20-cr-00286-004-DBB. In conjunction with the conviction, ETR

Services, LLC admitted in a Statement in Advance of Plea:

> Beginning on or about May 9, 2019 and continuing through June 18, 2019, while
> in the District of Utah, members of ETR Services LLC and RBE Solutions LLC
> used bank accounts opened in the name RBE Solutions LLC and ETR Services
> LLC, entities formed by Ruzanna Emuveyan and her husband, to receive and
> remit money on behalf of others in exchange for a fee. Neither the entities, Mrs.
> Emuveyan's husband, nor Mrs. Emuveyan were licensed to operate a money
> transmitting business as required by the laws of the State of Utah, nor were they
> registered as required by section 5330 of the Title 31, United States Code. The
> State of Utah makes it a misdemeanor to operate a money transmitting business
> without a license under Sections 7-25-201 and 7-25-405 of the Utah Code.

### b) The $29,970.34 wired to Kickerillo on May 29, 2019, traces to romance scam victim VICTIM 2

40.     The $29,970.34 wire from RBE's JPMC 1869 to Kickerillo on May 29, 2019,

traces to money obtained by false pretenses from VICTIM 2, a victim of the scam described

above.

41.     On May 29, 2019—just one day after wiring $78,000 to ETR—VICTIM 2 wired

$79,000 from VICTIM 2's bank account in New York to RBE's JPMC 1869 in Utah, based on

the false or fraudulent representations and promises of Wong described above.

42.     RBE opened JPMC 1869 with an address in Saratoga Springs, Utah on March 16,

2019.

43.     RBE was a domestic limited liability company registered in Utah by Ruzanna on

or about May 9, 2019, with an address in Saratoga Springs, Utah. RBE was dissolved on or about

September 15, 2020.

44.     On May 29, 2019, RBE's JPMC 1869 in Utah wired $29,970.34 to Kickerillo's account in Texas toward the purchase of the Defendant Property. The funds in this wire trace to VICTIM 2's wire to RBE on May 29th.

45.     RBE was convicted on April 21, 2022, in the District of Utah of Conducting an Unlicensed Money Transmitting Business in violation of 18 U.S.C. § 1960 in *United States v. RBE Solutions LLC*, No. 2:20-cr-00286-003-DBB. In conjunction with the conviction, RBE Solutions LLC admitted in a Statement in Advance of Plea:

> Beginning on or about May 9, 2019 and continuing through June 18, 2019, while in the District of Utah, members of ETR Services LLC and RBE Solutions LLC used bank accounts opened in the name RBE Solutions LLC and ETR Services LLC, entities formed by Ruzanna Emuveyan and her husband, to receive and remit money on behalf of others in exchange for a fee. Neither the entities, Mrs. Emuveyan's husband, nor Mrs. Emuveyan were licensed to operate a money transmitting business as required by the laws of the State of Utah, nor were they registered as required by section 5330 of the Title 31, United States Code. The State of Utah makes it a misdemeanor to operate a money transmitting business without a license under Sections 7-25-201 and 7-25-405 of the Utah Code.

### c) The $10,000 wired to Kickerillo on May 28, 2019, was connected to Adigbolo's Money Laundering Scheme.

46.     The $10,000 wire from Iwezu's Wells Fargo 7829 to Kickerillo on May 28, 2019, traces to money connected to Adigbolo. The $10,000 wire transfer from Iwezu's Wells Fargo 7829, to Kickerillo on May 29, 2019, is connected to Adigbolo's money laundering conspiracy, referenced above, and which Adigbolo pleaded guilty to on November 15, 2021.

47.     During an interview of Adigbolo with FBI investigators on October 4, 2019, Adigbolo admitted that as part of his scheme, he received many packages of cash at his address in Pleasant Grove, Utah for "Raymond Maxwell." Multiple victims reported to law enforcement sending hundreds of thousands of dollars in cash to "Raymond Maxwell" in Utah. Adigbolo

further admitted that he was instructed by others involved in the criminal scheme to mail the cash

to other persons including Iwezu in Montgomery, Alabama. On multiple occasions Adigbolo

mailed cash to Iwezu in Montgomery, Alabama.

48.     WhatsApp communications of Adigbolo obtained by the FBI corroborated

Adigbolo's statements to investigators. For example, WhatsApp messages on March 6, 2019,

show Adigbolo sent a screenshot of package tracking information with messages including "out

for delivery" and "Just land for Jimmy." The tracking information included a package delivery in

Montgomery, Alabama. According to public records and Wells Fargo bank statements, Iwezu

lived in the Montgomery, Alabama area.

49.     On May 28, 2019, Iwezu's Wells Fargo 7829 received a cash deposit of $10,058.

Prior to this deposit, Wells Fargo 7829 had a balance of $301.17.

50.     On May 28, 2019, Iwezu's Wells Fargo 7829 in Alabama wired $10,000 to

Kickerillo's account in Texas toward the purchase of the Defendant Property. This wire included

funds traceable to the $10,058 cash deposit into Wells Fargo 7829 on May 28, 2019.

### 2. Eight Kickerillo Payments totaling $308,568 trace to other romance scams and a medical billing fraud.

#### a) The $53,200 cashier's check deposited in Kickerillo's account on April 27, 2020, traces to romance scam victim VICTIM 3 and fraud victim COMPANY VICTIM 1.

51.     The $53,200 cashier's check from Martin Fritz's JPMC 5891 deposited in

Kickerillo's account on April 27, 2020, traces to money obtained by false pretenses from

VICTIM 3, a victim of a romance scam who lost approximately $40,000, and COMPANY

VICTIM 1, a victim of fraud who lost approximately $3,000,000.

52.     In January 2020, VICTIM 3, a substitute schoolteacher from Virginia, received a Facebook friend request from "James Armstrong" (Armstrong). Armstrong said he was a marine engineer working on an oil rig off the Ireland coast and that his wife died of cancer. Armstrong claimed to own two homes, one in Washington D.C. where his teenage son attended boarding school.

53.     In February 2020, about one month after meeting, at Armstrong's request, VICTIM 3 sent $5,000 to "Mike Fritz" (Fritz) to pay the legal cost of a marriage certificate so they could be married. This money came from VICTIM 3's personal savings.

54.     Shortly after they met in 2020, Armstrong claimed that he had approximately $2,200,000 that he intended to transfer back to the United States into an account in VICTIM 3's name. VICTIM 3 received a document dated February 14, 2020, with a Chase Bank logo that purported to be a "Statement of Account." VICTIM 3 received this document from Frank Herbert (Herbert), reportedly an Operations Manager for Chase Bank in the United Kingdom. The document showed VICTIM 3's name on the account, as well as her driver's license number and other account details. Herbert later contacted VICTIM 3 and told VICTIM 3 that when he attempted to transfer the funds to VICTIM 3's account, he got an error message. Herbert told VICTIM 3 that VICTIM 3 needed to pay a $18,620 transfer fee. VICTIM 3 wired the $18,620 to an account designated by Herbert after taking out a March 28, 2020 home-equity loan of $25,000.

55.     Based on Armstrong and Herbert's false or fraudulent representations, or promises, VICTIM 3 transferred approximately $40,000.

14

56.     On April 14, 2020, as Herbert directed, VICTIM 3 electronically transferred $18,620 from VICTIM 3's bank in Ohio to Fritz's JP Morgan Chase (JPMC) 5891 in Georgia. Prior to VICTIM 3's transfer, JPMC 5891 had a balance of $765.95.

57.     JPMC 5891 was opened on February 19, 2020. JPMC 5891 bank statements to Fritz were sent to an address in Atlanta, Georgia.

58.     Immediately after the $18,620 wire, JPMC 5891 received a $120,000 deposited check from Tony Best Enterprises LLC's Regions Bank 2193 in Georgia. Regions Bank 2193 showed a minimal balance starting on December 12, 2019, until multiple deposits totaling $975,483.05 with the statement description "hcclaimpmt" were made in March and April 2020. These funds trace to scam victim COMPANY VICTIM 1 and were used to fund the $120,000 check to JPMC 5891.

59.     COMPANY VICTIM 1 contacted one of its providers on April 17, 2020, to inquire about overdue payments. The provider presented COMPANY VICTIM 1 with a copy of an "Authorization Agreement for Electronic Funds Transfer" that the provider received on March 4, 2020. The funds transfer authorization had a forged signature from an employee of COMPANY VICTIM 1. This form had fraudulently changed the bank account information for the account receiving payments from the provider to Regions Bank 2193. Five electronic fund transfers that should have gone to COMPANY VICTIM 1 went instead to Regions Bank 2193.

60.     After the $18,620 and $120,000 deposits, multiple withdrawals were made from JPMC 5891, until on April 24, 2020, a $53,200 cashier's check was purchased that included funds traceable to VICTIM 3 and COMPANY VICTIM 1. At the time of the cashier check's purchase, JPMC 5891 had a balance of $111,090.71.

61.     On April 27, 2020, the $53,200 cashier's check drawn on JPMC 5891 in Georgia was deposited in Kickerillo's account in Texas toward the Defendant Property's purchase.

> **b) The $31,000 cashier's check deposited in Kickerillo's account on June 16, 2020, traces to romance scam victim VICTIM 4**

62.     The $31,000 cashier's check from Willonrich Global Services LLC's JPMC 7352 deposited in Kickerillo's account on June 16, 2020, traces to money obtained by false pretenses from VICTIM 4, who lost more than $300,000 in a romance scam.

63.     The scam began in May 2019, when "Michael Gomez" (Gomez) contacted VICTIM 4 on Elite, an online dating website. VICTIM 4 owned of a profitable retail business in Saskatchewan, Canada. Gomez represented himself as a widower living in Poland where he was employed as the "head of diplomatic services" for the United States. Gomez pursued VICTIM 4 through regular telephone communications which developed, over the course of year, into what VICTIM 4 believed to be a romantic relationship.

64.     In about May 2020, Gomez told VICTIM 4 that he wanted to transfer his estate into her name. Gomez asked VICTIM 4 for victim 4's bank account information to direct the transfer of his estate.

65.     After VICTIM 4 gave him the bank account information, Gomez said he could not make the transfer because "tax payments" and "document fees" were owed to the Polish government.

66.     Believing she would get her money back after the estate's transfer, VICTIM 4 agreed to pay the "tax payments" and "document fees." In total, VICTIM 4 authorized the transfer of more than $300,000 from her bank account to pay these purported costs as instructed by Gomez.

67.     Based on Gomez's false or fraudulent representations, on June 8, 2020, VICTIM 4 authorized a $32,992.99 electronic transfer from VICTIM 4's bank account in Canada to Willonrich Global Services LLC's JPMC 7352 in Georgia.

68.     Willonrich Global Services LLC was a domestic limited liability company registered by in Georgia on May 4, 2020, with an address in Atlanta, Georgia.

69.     Two days later, on June 10, 2020, VICTIM 4's funds were used to purchase a cashier's check for $31,000 from Willonrich Global Services LLC's JPMC 7352. The check was deposited in Kickerillo's account in Texas on June 16, 2020, toward the Defendant Property's purchase.

### c) The $13,000 cashier's check deposited in Kickerillo's account on June 16, 2020, traces to romance scam victim VICTIM 5

70.     The $13,000 cashier's check from Fidelo Gallery LLC's Bank of America 8167 deposited in Kickerillo's account on June 16, 2020, traces to money obtained by false pretenses from VICTIM 5 who lost approximately $40,000 in a romance scam.

71.     VICTIM 5 met "Jason Carter" (Carter) in early 2020, after he sent a pen-pal request to her Line social media account. VICTIM 5 is a single woman of Asian descent in her late seventies who resided in Maryland. Carter claimed to be a surgeon for the United Nations in Yemen. Carter said his wife died while giving birth. VICTIM 5 also communicated with Carter's son, "David," who would refer to her as "Mother." On at least two occasions, VICTIM 5 and Carter communicated in a video chat.

72.     Within six months of meeting, Carter began asking VICTIM 5 for money because Carter claimed his life was in immediate danger unless he came up with the money.

73.     During June of 2020, VICTIM 5 sent a total of $40,000 in two wires as Carter directed.

74.     Based on Carter's false or fraudulent representations, on June 11, 2020, VICTIM 5 wired $15,000 from her Capital One bank account held in Mclean, Virginia to Fidelo Gallery LLC's Bank of America 8167 held in Stone Mountain, Georgia.

75.     Fidelo Gallery LLC was a Georgia domestic limited liability company with an address in Decatur, Georgia, registered on or about May 8, 2020, and dissolved on September 30, 2021.

76.     On June 12, 2020, Brown used VICTIM 5's funds to purchase a $13,000 cashier's check from Fidelo Gallery LLC's Bank of America 8167.

77.     On June 16, 2020, the cashier's check from Fidelo Gallery LLC's Bank of America 8167 in Georgia was deposited into Kickerillo's account at Amegy Bank in Plano, Texas at the Willow Branch, along with three other cashier's checks, for the Defendant Property's purchase.

### d) The $50,000 cashier's check deposited in Kickerillo's account on June 24, 2020, traces to romance scam victim VICTIM 6

78.     The $50,000 cashier's check from Sobana LLC's SunTrust 0062 deposited in Kickerillo's account on June 24, 2020, traces to money obtained by false pretenses from VICTIM 6, who lost approximately $160,000 in a romance scam.

79.     In April 2020, VICTIM 6 met "Robert Michel Willis" (Willis) through Match.com, a dating website. VICTIM 6 was a single mother living in Houston, Texas who worked for a medical researcher. Willis said he was a divorced engineer living in Mesquite, Texas, and working on a large energy project for Talos Energy in Laredo, Texas. VICTIM 6

18

believed she and Willis were in a romantic relationship and by summer 2020, she began planning

a future with him. Her plans included the joint purchase of a beach house in Galveston, Texas.

80.     In June 2020, Willis told VICTIM 6 there had been an accident at the work site

that caused damage to generators, and that he needed funds to repair the equipment before he

could complete his work on the project. Willis promised to repay VICTIM 6 when he returned

from the project.

81.     Believing there to be an emergency circumstance and that Willis would repay her

as he promised, VICTIM 6 transferred funds totaling between $150,000 to $170,000, as directed

by Willis.

82.     Based on the false or fraudulent representations of Willis, on June 15, 2020,

VICTIM 6 used her bank account in Texas to purchase a $50,000 cashier's check and a $26,000

cashier's check for Sobana LLC, which VICTIM 6 believed were going to be used for panels

and/or sound proofing of the generator at Willis's worksite.

83.     On June 15 and 16, 2020, the $50,000 and $26,000 cashier's checks respectively

were deposited into Sobana LLC's SunTrust 0062 in Georgia.

84.     Sobana LLC was a domestic limited liability company registered in Georgia on or

about February 14, 2020, with an address in Buford, Georgia.

85.     On June 22, 2020, VICTIM 6's funds were used to purchase a $50,000 cashier's

check from Sobana LLC's SunTrust 0062 in Georgia. On June 24, 2020, the $50,000 cashier's

check was deposited into Kickerillo's bank account in Texas toward the purchase of the

Defendant Property.

19

e) **The $13,635 cashier's check deposited in Kickerillo's account on June 26, 2020, traces to romance scam victim VICTIM 7**

86.     The $13,635 cashier's check from Fifth Third Bank 1697 deposited in Kickerillo's account on June 26, 2020, traces to money obtained by false pretenses from VICTIM 7, who lost approximately $150,000 in a romance scam.

87.     In early 2020, VICTIM 7 began communicating with "Josh Matteson" (Matteson) on Words with Friends, an online game, after Matteson sent a direct message to VICTIM 7's user account. VICTIM 7 is a widow in her seventies who resided in Pennsylvania. Matteson claimed to be a subcontractor for Exxon based in Newfoundland, Canada. By April 2020, communications between VICTIM 7 and Matteson became more frequent and included phone calls. From these communications, VICTIM 7 believed she was in a romantic relationship with Matteson.

88.     In April 2020, Matteson made his first request for money and between April 27, 2020, and September 1, 2020, VICTIM 7 made at least nine transfers totaling approximately $150,000 to various individuals at Matteson's direction. Matteson assured VICTIM 7 that VICTIM 7 would be paid back.

89.     Based on Matteson's false or fraudulent representations, on June 23, 2020, VICTIM 7 wired $32,000 from VICTIM 7's bank in New York to Desheal N. Winfrey's Fifth Third Bank 1697 in Georgia.

90.     On June 25, 2020, VICTIM 7's money was used to purchase a $13,635 cashier's check from Desheal N. Winfrey's Fifth Third Bank 1697 in Georgia. On June 26, 2020, the $13,635 cashier's check was deposited in Kickerillo's bank account in Texas toward the purchase of the Defendant Property.

### f) The $55,000 cashier's check deposited in Kickerillo's account on July 6, 2020, traces to romance scam victim VICTIM 8

91.     The $55,000 cashier's check from Avjex Global LLC's First IC Bank 5733 deposited in Kickerillo's account on July 6, 2020, traces to money obtained by false pretenses from VICTIM 8, who lost approximately $470,000 in a romance scam.

92.     In March 2020, VICTIM 8 met "Sean Wayne" (Wayne) on eHarmony.com, a dating website. VICTIM 8 was a single woman in her sixties living in Nebraska who had lost her husband to cancer less than a year before meeting Wayne. Wayne claimed to own an oil drilling company named Wayne Petrochemicals. Wayne convinced VICTIM 8 that he was starting a drilling project in Mexico with Exxon Mobil but needed money to complete the project. VICTIM 8 ultimately transferred money to Wayne multiple times at Wayne's direction.

93.     On June 13, 2020, based on Wayne's false or fraudulent representations, VICTIM 8 used her bank account in Nebraska to purchase an $83,000 cashier's check.

94.     On June 16, 2020, the $83,000 check was deposited into Avjex Global LLC's First IC Bank 5733 in Georgia.

95.     On June 24, 2020, VICTIM 8's money was used to purchase a $55,000 cashier's check from Avjex Global LLC's First IC Bank 5733. On or about July 6, 2020, this check was deposited in Kickerillo's bank account in Texas toward the purchase of the Defendant Property.

### g) The $50,233 cashier's check deposited in Kickerillo's account on June 24, 2020, traces to scam victims VICTIM 9 and VICTIM 10

96.     The $50,233 cashier's check from De Premium Entertainment LLC's Bank of America 4227 deposited in Kickerillo's account on June 24, 2020, traces to money obtained by

false pretenses from VICTIM 9 and VICTIM 10, victims of a false friendship scam who respectively lost approximately $212,000 and $19,600.

97.     In May 2020, VICTIM 9 met "Scott Arnold" (Arnold) on WeChat, a social media website. VICTIM 9 resided in Glendale, Arizona where she owned and operated a popular restaurant. Arnold claimed to be a physician working overseas for the United Nations. He told VICTIM 9 that a nanny was caring for his daughter in Utah because she was ill and needed surgery.

98.     After about a month of communicating through WeChat and by phone, Arnold began telling VICTIM 9 that he needed help paying for his daughter's care. Arnold asked VICTIM 9 to help him with his daughter's care and medical expenses. Arnold told VICTIM 9 that he would send money to VICTIM 9 so that VICTIM 9 could make the payment to the nanny in Utah.

99.     Based on Arnold's false representations and promises, VICTIM 9 transferred approximately $212,000 of VICTIM 9's own money in multiple transactions to various persons and accounts as Arnold directed. VICTIM 9 never received any money from Arnold.

100.    On June 19, 2020, based on the false or fraudulent representations of Arnold, VICTIM 9 wired $59,850 from VICTIM 9's bank in Arizona to De Premium Entertainment LLC's Bank of America 4227 in Georgia.

101.    De Premium Entertainment LLC was a Georgia domestic limited liability company registered on or about October 16, 2019, with an address in Atlanta, Georgia.

102.    In February 2020, VICTIM 10 accepted a social media friend request from "Steve Williams" (Williams). VICTIM 10 was nearly 80-years old, living in Florida, and hoping to find

a pen pal. Williams said he worked for the "UN" overseas and that his son attended school in Dubai. VICTIM 10 and Williams primarily communicated over Google Hangouts.

103.    Williams claimed that his son suffered a head injury and would die without urgent medical treatment. He said he needed to borrow the money to pay for the treatment. Having lost a son herself, VICTIM 10 wanted to help and agreed to loan Williams some of the money he needed. Williams agreed to pay VICTIM 10 back.

104.    Based on William's false or fraudulent representations and promises, between March 2020 and June 2020, VICTIM 10 transferred at least $19,600 of VICTIM 10's money, in six transactions directed by Williams.

105.    On June 22, 2020, as directed by Williams, VICTIM 10 transferred $10,800 from VICTIM 10's bank in Florida to De Premium Entertainment LLC's Bank of America 4227 in Georgia.

106.    On the same day, June 22, 2020, VICTIM 9 and VICTIM 10's money was used to purchase a $50,233 cashier's check from De Premium Entertainment LLC's Bank of America 4227 to Kickerillo.

107.    On June 24, 2020, the $50,233 cashier's check was hand-delivered and deposited with three other cashier's checks (a $50,000 cashier's check purchased from Sobana LLC's SunTrust 0062; a $27,000 cashier's check purchased from Vic & Lenny LLC's Bank of America 2830; and a $30,000 cashier's check purchased from Ehpraim Ngala's JPMC 0990), each traceable to different fraud schemes, for a combined deposit of $157,233 into Kickerillo's bank account in Texas toward the purchase of the Defendant Property.

108.     The June 24, 2020 bulk deposit of four cashier's checks required the coordinated

purchase, physical collection, and delivery for of four cashier's checks deposit, each purchased

from three different banks on the same day (June 22, 2020) from four different bank accounts,

and with funds traceable to multiple victims of various fraud schemes.

### h) The $42,500 cashier's check deposited in Kickerillo's account on April 26, 2020, involved laundered proceeds.

109.     The $42,500 cashier's check, from De Premium Entertainment LLC's Bank of

America 4227, deposited in Kickerillo's account on April 26, 2020, traces to money involved in

schemes to defraud and money laundering.

110.     Based on the above details showing that the $50,233 cashier's check deposited in

Kickerillo's account was traceable to money fraudulently obtained from victims VICTIM 9 and

VICTIM 10, De Premium Entertainments LLC's Bank of America 4227 was being used as a

conduit to facilitate the laundering of fraud proceeds.

111.     Furthermore, bank account statements for Bank of America 4227 show on April

20, 2020, it received a $50,000 wire deposit from a foreign source described as "Amsterdam

MWH Alberts-Geertsma."

112.     On April 21, 2020, the money from the foreign source was used to purchase a

$42,500 cashier's check with a $15 bank fee from Bank of America 4227 in Georgia to

Kickerillo.

113.     On April 26, 2020, the $42,500 cashier's check was deposited in Kickerillo's

bank account in Texas toward the purchase of the Defendant Property.

### 3. Two Kickerillo Payments totaling $87,000 trace to advance-pay fraud schemes involving Vic & Lenny LLC.

#### a) The $27,000 cashier's check deposited in Kickerillo's account on June 24, 2020, traces to scam victims VICTIM 11 and VICTIM 12.

114.    The $27,000 cashier's check from Vic & Lenny LLC's Bank of America 2830, deposited in Kickerillo's account on June 24, 2020, traces to money obtained by false pretenses from VICTIM 12, the victim of an advance-pay fraud scheme who lost more than $150,000, and VICTIM 11, the victim of an inheritance scam who lost approximately $13,000.

115.    VICTIM 12 was an engineer and frequent investor in new products who was involved in multiple businesses. VICTIM 12 resided in Santa Barbara, California. In early 2020, VICTIM 12 had a fast business that needed a lot of cash, so VICTIM 12 was looking for outside funding.

116.    "Jeffrey Wayne" (Wayne) emailed VICTIM 12 about an offer of unsecured financing from Wayne Group Ltd. (WGL). Based on his communications with Wayne, a LinkedIn profile for WGL, and an apparent physical office location in Nevada that VICTIM 12 had someone drive by, VICTIM 12 believed WGL to be a legitimate financer.

117.    WGL was a domestic limited liability company in Nevada with an address at 1662 US Hwy 395, Suite 208, Minden, Nevada 89423.

118.    A LinkedIn page for a "Jeffrey Wayne" indicated that he had been the "Pres" of "The Wayne Group Ltd" from "Jul 1990 – Present."

119.    VICTIM 12 communicated with Wayne by email, text, and telephone. VICTIM 12 thought that Wayne had a foreign accent that sounded like a mix of Asian and Filipino.

120.    Wayne told VICTIM 12 that he needed to make some advance payments to receive $1,000,000 in unsecured funding from WGL. Based on the false or fraudulent representations and promises of Wayne, VICTIM 12 initiated the following wires from VICTIM 12's bank account in California:

| Date | Acct # | Recipient | Amount |
|---|---|---|---|
| 5/2/2020 | 8238 | The Magnitude Development Group LLC | $15,000 |
| 5/21/2020 | 8238 | The Magnitude Development Group LLC | $25,000 |
| 6/2/2020 | 2026 | Vic & Lenny LLC | $30,000 |
| 6/22/2020 | 2830 | Vic & Lenny LLC | $30,000 |
| 1/29/2021 | 5021 | Vic & Lenny LLC | $4,490 |

121.    As described below, The Magnitude Development Group LLC, which VICTIM 12 wired money to, was also used to receive fraudulently obtained PPP loan fraud proceeds.

122.    Vic & Lenny LLC was a domestic limited liability company registered in Louisiana on or about August 20, 2015, and by in Georgia on May 21, 2020. The company's Louisiana registration listed an address in New Orleans, Louisiana, and the company's Georgia registration listed an address in Atlanta, Georgia. Vic & Lenny LLC was dissolved in Louisiana on or about November 15, 2018. Vic & Lenny LLC was dissolved in Georgia on or about October 28, 2022.

123.    VICTIM 12 never received the loan promised by Wayne.

124.    VICTIM 12 lost all the money that VICTIM 12 wired at Wayne's direction.

125.    VICTIM 11 is a veteran and former pilot with United Airlines residing in New York. In approximately May 2019, VICTIM 11 received an email from "Juerg Hess" (Hess). Hess provided a profile showing that he had been a former IBM attorney in Switzerland for approximately 25 years and was associated with Laux Lawyers AG, based in Zurich, Switzerland. Hess claimed to be an attorney working on behalf of the estate of a purported

26

cousin of VICTIM 11 residing in Switzerland. Hess claimed that VICTIM 11's cousin and his family had been killed in a car accident and VICTIM 11 was identified as the nearest next of kin. Hess claimed that VICTIM 11's cousin had an estate worth $18.2 million obtained from being an oil baron in the Middle East.

126.    All the documentation that Hess and two other associates of Hess sent to VICTIM 11 looked very official and authentic to VICTIM 11.

127.    Hess told VICTIM 11 that a tax bill of $97,000 had to be cleared for the estate monies to be released. Hess said that the taxes could not be deducted from the inheritance. Hess said that he had sold $45,000 in stock that he could put toward the taxes. Hess also claimed that they could get a $50,000 loan from Vic & Lenny LLC, but they would need $7,500 up front.

128.    On June 10, 2020, VICTIM 11 obtained a $7,500 personal money order from his bank in New York.

129.    On June 17, 2020, the $7,500 money order was deposited into Vic & Lenny LLC's Bank of America 2830 in Georgia.

130.    VICTIM 11 never received the supposed inheritance.

131.    On June 23, 2020, VICTIM 11 and VICTIM 12's money was used to purchase a $27,000 cashier's check from Vic & Lenny LLC's Bank of America 2830 in Georgia. This cashier's check was deposited on June 24, 2020, into Kickerillo's bank account in Texas as a payment toward the purchase of the Defendant Property.

b) **The $60,000 cashier's check deposited in Kickerillo's account on July 9, 2020, traces to advance pay scam victims VICTIM 13, VICTIM 14, and VICTIM 15.**

132.    The $60,000 cashier's check from Vic & Lenny LLC's Wells Fargo 2026 deposited in Kickerillo's account on July 9, 2020, traces to money obtained by false pretenses from VICTIM 13, VICTIM 14, and VICTIM 15, victims of an advance-pay fraud scheme who lost more than $75,000.

133.    VICTIM 13 and his wife are the owners of a wedding and event venue in New York. VICTIM 13 was seeking to refinance their business's event venue. At the recommendation of his brother, VICTIM 13 reached out to a broker in Albany, New York. The broker encouraged VICTIM 13 to pursue private financing and suggested "Jeff Wayne" who did business as "Wayne Enterprises" (referring to WGL) because the broker had done deals with Wayne in the past.

134.    The broker reached out to Wayne and facilitated an $825,000 loan with a loan origination fee of approximately $12,000.

135.    Based on the false or fraudulent representations of Wayne, VICTIM 13 wired what he thought was to be the loan origination funds to "Vic & Lenny, LLC." Bank records confirm that on June 29, 2020, VICTIM 13 wired $12,375 from VICTIM 13's bank account in New York to Vic & Lenny, LLC's Wells Fargo 2026 in Georgia.

136.    Vic & Lenny, LLC's Wells Fargo 2026 was opened in May 2020, with a listed address for the company in Atlanta, Georgia. The application noted that Vic & Lenny LLC was established on January 1, 2020, with one employee and annual gross sales of $100 as of May 29,

2020. Vic & Lenny LLC's industry was listed as "Construction" and the description of the business as "build a gym layout."

137.    After VICTIM 13 wired the money, VICTIM 13 found it very difficult to contact Wayne. Sometime after the payment, Wayne emailed VICTIM 13 and said he had been delayed getting back to VICTIM 13 because he had been hospitalized with Covid.

138.    VICTIM 13 called Wayne in approximately September 2020 using a number that he obtained from Jeff Wayne with a Las Vegas, Nevada area code. Wayne spoke with a thick accent. When asked by VICTIM 13 about the progress of the loan, Wayne did not provide an adequate explanation to VICTIM 13.

139.    In approximately October 2020, Wayne emailed VICTIM 13 to ask that he pay another $10,000 for insurance on the loan. VICTIM 13 refused and requested that Wayne return his money. Wayne never returned VICTIM 13's money. VICTIM 13 never received the promised loan.

140.    VICTIM 14 is a retired welder in his 70s from Ohio. VICTIM 15 is VICTIM 14's nephew. VICTIM 15 resided in Florida and was employed in aviation. VICTIM 15 was contacted by "Jeffrey Wayne," owner of "The Wayne Group" (referring to WGL) based in Minden, Nevada, by telephone in the Spring of 2020 regarding an investment opportunity in silver mining. Wayne told VICTIM 15 he was involved in private-loan funding and that he was seeking funding for a silver mine in Nevada. Wayne told VICTIM 15 there was a one-percent fee of $150,000 for an investment that would yield $15 million.

141.    VICTIM 15 researched WGL and believed it was legitimate because VICTIM 15 found no negative reports on WGL and VICTIM 15 contacted one former client of Wayne's to verify WGL's legitimacy.

142.    Wayne agreed to accept half of the fee upfront but said VICTIM 15 needed other investors.

143.    VICTIM 15 convinced his uncle, VICTIM 14, to invest. Using funds from the sale of stocks and $16,000 that VICTIM 15 wired to VICTIM 14, on or about July 2, 2020, based on Wayne's false or fraudulent representations, VICTIM 14 wired what VICTIM 14 thought was the initial investment of $75,000 from VICTIM 14's bank account in Ohio to Vic & Lenny LLC's Wells Fargo 2026 in Georgia.

144.    Wayne told VICTIM 15 that the investment would close with one week and the payout would yield $15 million. The "investment" never closed and VICTIM 15 and VICTIM 14 lost all the money they gave to Wayne.

145.    Vic & Lenny, LLC's Wells Fargo 2026 had a $22.80 balance prior to receiving the $12,375 wire from VICTIM 13 on June 29, 2020, and a $102,045.42 balance prior to receiving the $75,000 wire from VICTIM 14 on July 2, 2020.

146.    On July 6, 2020, VICTIM 13, VICTIM 14, and VICTIM 15's money was used to purchase a $60,000 cashier's check from Vic & Lenny, LLC's Wells Fargo 2026 in Georgia. On July 9, 2020, this cashier's check was deposited into Kickerillo's bank account in Texas toward the purchase of the Defendant Property.

### 4.  Two Kickerillo Payments totaling $180,000 trace to PPP/EIDL loan fraud.

#### a)  The $150,000 cashier's check deposited in Kickerillo's account on June 19, 2020, traces to proceeds of PPP loan fraud.

147.    The $150,000 cashier's check from Magnitude Development Group LLC's Bank of America 8877 deposited in Kickerillo's account on June 19, 2020, traces to PPP loan funds Scott Jackson Davis (Davis) fraudulently obtained. Davis was convicted in the Houston Division of the Southern District of Texas of defrauding the Small Business Administration in *United States v. Scott J. Davis*, No. 4:21-cr-577 (Davis Criminal Case).

148.    On or about May 26, 2022, Davis was convicted in the Davis Criminal Case of wire fraud, in violation of 18 U.S.C. § 1343, for submitting three false and fraudulent PPP loan applications for which he received three separate PPP loans in May 2020.

149.    As part of a May 26, 2022 plea agreement in the Davis Criminal Case, Davis admitted:

> At all times relevant to the Indictment, Defendant was a citizen of the United States and a resident of Harris County, Texas, and Defendant claimed to represent business entities named Skilled Trade Investments, LP ("STILP"), Skilled Trade Staffing, LLC ("STS"), and Skilled Trade Investments GP, LLC ("STIGP"). Between in or around April and in or around May 2020, Defendant submitted three false and fraudulent PPP loan applications to Financial Institution 1 (two of the three transactions through Company 1) in the name of his companies making use of interstate wire communications. The applications falsely represented STILP, STS, and STIGP's payroll and number of employees. Specifically, on or about April 30, 2020, Defendant submitted an application for STILP claiming 113 employees, a monthly payroll of $233,469, and requested a loan amount of $583,673; on or about May 2, 2020, Defendant submitted an application for STS claiming 87 employees, a monthly payroll of $387,000 and requested a loan amount of $967,500; and on or about May 2, 2020, Defendant submitted an application for STIGP claiming 138 employees, a monthly payroll of $718,256, and requested a loan amount of $1,795,640. To support these fraudulent assertions, Defendant fabricated supporting records which he included with each PPP loan application. For example, Defendant fabricated IRS Form 941s for STS,

STILP, and STIGP which Defendant knew had never been filed with the IRS. In the STS, STILP, and STIGP Loan applications, Defendant listed addresses for his business, including 16190 Farm to Market 2920, Suite A, Tomball, Texas 77377 which was not ever the actual location of that business. In addition, the PPP loan applications that Defendant submitted for STS, STILP, and STIGP required that he certify that "within the last 5 years, for any felony, has the Applicant or any owner of the Applicant been: 1) convicted, 2) pleaded guilty, 3) pleaded nolo contendere, 4) been placed on pretrial diversion, or 5) been placed on any form of parole or probation. Defendant responded "No" when, in fact, as Defendant knew, on April 5, 2017, he plead guilty to one count of wire fraud in the Southern District of Texas was sentenced to 37 months BOP followed by three years supervised release. Defendant, for the purpose of executing the aforesaid scheme to defraud, and attempting to do so, did knowingly transmit and caused to be transmitted, by means of wire communications in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds: an electronic transfer on May 4, 2020, of $583,673 representing PPP loan disbursement for STILP from Financial Institution 1 to Financial Institution 2 account x7506; an electronic transfer on May 5, 2020, of $1,795,640 representing PPP loan disbursement for STIGP from Financial Institution 1 to Financial Institution 2 account x3432; and an electronic transfer on May 7, 2020, of $967,500 representing PPP loan disbursement for STS from Financial Institution I to Financial Institution 2 account x6400. After Defendant received the proceeds of the PPP loan funds, he spent it on items that he knew not to be permissible under the rules or purpose of the PPP, including: buying real estate, luxury vehicles, and private jet travel.

150.    In the loan applications, Davis falsely claimed that his shell business entities had payroll expenses and then fabricated documents to support falsifications in the loan application, as well as falsely certifying that that he had no prior felony convictions.

151.    The falsified applications resulted in the funding of three PPP loans for fake businesses. In May 2020, funds for all three PPP loans disbursed to Davis.

152.    On May 5, 2020, Davis received $1,795,640 in PPP loan funds into Skilled Trade Investment Group's Bank of America 3432 in Texas.

153.    On June 10, 2020, $300,000 was transferred from Skilled Trade Investment Group's Bank of America 3432 in Texas to The Magnitude Development Group LLC's Bank of America 8877 in Georgia.

154.    Statements for The Magnitude Development Group LLC's Bank of America 8877 indicated that the business name was a DBA for a sole proprietor with an address in Brookhaven, Georgia.

155.    On June 12, 2020, the PPP loan funds were used to purchase a $150,000 cashier's check from The Magnitude Development Group LLC's Bank of America 8877 in Georgia to Kickerillo. The check was deposited in Kickerillo's account in Texas on June 19, 2020, as payment toward the purchase of the Defendant Property.

   **b) The $30,000 cashier's check deposited in Kickerillo's account on June 24, 2020, traces to EIDL loan fraud.**

156.    The $30,000 cashier's check from Ehpraim Ngala's Chase 0990 deposited into Kickerillo's account on June 24, 2020, traces to EIDL funds obtained by Scottline LLC (Scottline).

157.    Scottline was a domestic limited liability company registered in New Jersey on or about February 2019.

158.    Under the provisions of The CARES Act, enacted in March 2020, $2.2 trillion dollars in economic stimulus was made available to businesses injured by the economic decline caused by the COVID-19 pandemic in the United States.

159.    The provisions of The CARES Act, in conjunction with an officially declared disaster by the United States government, allowed for the SBA to offer EIDL loans to business owners negatively affected by the COVID-19 Pandemic. Using the SBA online portal, EIDL

applicants submitted personal and business information in support of each EIDL application. Applicants were not required to submit supporting documentation.

160.    The EIDL application included a jurat-like paragraph where the applicant affirms that the information submitted is true and correct under penalty of perjury and applicable criminal statutes. The application process involved filling out assorted data fields relating to the size of the affected business entity, the business's ownership, and other information such as the number of employees, gross business revenues realized in the 12 months prior to the COVID-19 impact on the national economy, and payroll. SBA then used this information submitted by the applicant to calculate the principal amount of the EIDL funds the small business was eligible to receive.

161.    When each EIDL application was submitted, it travelled via the internet, thus affecting interstate commerce, and was then received by computer servers in the State of Iowa. The information was used to populate an electronic loan file, which was then transmitted to the SBA's Denver Finance Center in Colorado. The SBA loan evaluation and approval process triggered the electronic disbursement of SBA loan proceeds that were held in Federal Reserve Banks throughout the United States to the intended recipient deposit account.

162.    EIDL Program rules required the loan proceeds to be used by the receiving business, which must have existed on and prior to February 1, 2020, on certain permissible expenses. Permissible expenses included payment of fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

163.    The SBA Office of Disaster Assistance (ODA) controls the EIDL program and is headquartered at 409 3rd Street SW, Washington, DC 20416. The ODA has authority over all

loans created and disbursed under the EIDL program. EIDL principal proceeds and available Cash Advance Grants (up to $10,000) are solely funded by the SBA and are disbursed from government-controlled accounts maintained with the U.S. Treasury at Federal Reserve Banks throughout the United States.

164.    On June 18, 2020, the SBA disbursed $91,900 in EIDL funds to Scottline by making an electronic funds transfer deposit into Scottline's East West Bank 1446 in Texas. The following day, $39,500 of the EIDL loan disbursement was transferred to Ehpraim Ngala's Chase 0990 in Georgia, which prior to the transfer had a balance of $6.04. A wire memo indicated "Consulting Invoice Payment."

165.    On June 22, 2020, Ehpraim Ngala used the EIDL funds to purchase a $30,000 cashier's from Ehpraim Ngala's Chase 0990 in Georgia payable to Kickerillo. The check was deposited in Kickerillo's account in Texas on June 24, 2020, as payment toward the purchase of the Defendant Property.

### C. Five Kickerillo Payments totaling $130,000 trace to funds in accounts owned by Muideen Dauda involved in illegal structuring.

166.    The Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5311 *et seq.*, also known as the Bank Secrecy Act ("BSA"), was designed to combat money laundering, tax evasion, and other crimes by, in part, imposing reporting requirements on virtually all commercial transactions involving more than $10,000 in United States currency.

167.    Specifically, under 31 U.S.C. § 5313(a) and its related regulations including 31 C.F.R. §§ 1010.311 and 1010.100(xx), when a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency ("cash") in an amount greater than $10,000, the institution is required to file a Currency Transaction Report

("CTR") for each cash transaction, such as, by way of example, a deposit, withdrawal, exchange of currency, or other payment or transfer by, through, or to a financial institution. CTRs are filed with the Financial Crimes Enforcement Network ("FinCEN") on forms that require, among other things, the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed.

168.    The BSA regulations also require that multiple transactions be treated as a single transaction if the financial institution has knowledge that they are by, or on behalf of, the same person, and they result in currency either received or disbursed by the financial institution totaling more than $10,000 during any one business day.

169.    Some involved in illegal activities, such as drug trafficking and money laundering, are aware of these reporting requirements and take active steps to cause financial institutions to fail to file CTRs. For example, such people may "structure" transactions with a financial institution to avoid the filing of a CTR by making multiple cash deposits or withdrawals in amounts less than or equal to $10,000, but which in the aggregate exceed $10,000, with multiple banks and/or branches of the same bank on the same day or on consecutive days. This conduct is prohibited by 31 U.S.C. § 5324.

170.    As explained in *United States v. Peterson*, 607 F.3d 975 (4th Cir. 2010), structuring can take several forms. Making multiple deposits of $10,000 or less into the same bank on the same day, with the total exceeding $10,000, is called "imperfect structuring" because the bank's obligation to file a CTR is triggered notwithstanding the customer's intent to evade it. Making multiple deposits into different banks on the same day totaling more than $10,000 but no single deposit exceeding $10,000 is called "perfect structuring" because no one

36

bank has a duty to file a CTR. Imperfect structuring is a violation of 31 U.S.C. § 5324(a)(1), and

perfect structuring is a violation of 31 U.S.C. § 5324(a)(3). *Peterson*, 607 F.3d at 981.

171.    Max Credit Union (MCU) and BBVA Compass Bank (Compass) were financial

institutions, as defined by 31 U.S.C. § 5312(a)(2)(A), with branches including in Alabama. The

Federal Deposit Insurance Corporation (FDIC) insured MCU and Compass. As domestic

financial institutions insured by the FDIC, MCU and Compass Bank were subject to the

requirements of the BSA, and the regulations prescribed under it by the Secretary for the

Department of the Treasury. Compass was later acquired by PNC Financial Services.

### 1.    The $30,000 wired to Kickerillo on March 19, 2019, traces to structured funds or funds involved in structuring.

172.    The $30,000 wire to Kickerillo's account on March 19, 2019, traces to structured

funds or funds involved in structuring.

173.    On January 30, 2017, Muideen Dauda (Dauda) opened Compass 6624 in the name

of Auto N Beyond, a sole proprietorship owned by Dauda. Dauda was the sole signor on the

account. The account application included a 2016–2017 occupational license issued by Alabama

to Auto N Beyond that listed it as a single store with a business address at 2332 W Fairview

Avenue, Montgomery, Alabama.

174.    An August 23, 2023 online search for Auto N Beyond returned information and

photographs of a business appearing to sell used vehicles.

175.    On February 21, 2019, Compass 6624 had a balance of $37,892.11 prior to

receiving five cash deposits totaling $35,400 during March 2019. Each deposit was under

$10,000:

| Date | Amount |
|------|--------|

| | |
|---|---|
| 3/12/2019 | $7,000 |
| 3/13/2019 | $5,500 |
| 3/14/2019 | $5,300 |
| 3/15/2019 | $9,100 |
| 3/18/2019 | $8,500 |

176.     On March 19, 2019, $30,000 traceable to structured funds or funds involved in structuring were wired from Compass 6624 in Alabama to Kickerillo's account in Texas as payment toward the purchase of the Defendant Property.

### 2. The $15,000 wired to Kickerillo on February 20, 2019, traces to structured funds or funds involved in structuring.

177.     Prior to and after wiring the $30,000 to Kickerillo on March 19, 2019, Dauda also wired funds to Kickerillo for payments on the Defendant Property through MCU accounts.

178.     Account statements for MCU 690.0010 listed that same business address as the one listed for Dauda's Auto N Beyond.

179.     On February 19, 2019, when the balance of MCU 690.0010 was $1,870.50, Dauda deposited $9,900 cash into the account. Also on February 20, 2019, Dauda deposited $5,600 cash into the account making the account balance approximately $17,370.

180.     On February 20, 2019, $15,000 traceable to structured funds or funds involved in structuring were wired from MCU 690.0010 in Alabama to Kickerillo's account in Texas toward the purchase of the Defendant Property.

### 3. The $35,000 wired to Kickerillo on March 20, 2019, traces to structured funds or funds involved in structuring.

181.     A day after Dauda wired funds to Kickerillo using his Auto N Beyond account, Dauda wired $35,000 to Kickerillo on March 20, 2019, using an account held by Maybak LLC.

182.    On November 7, 2018, Dauda opened MCU 259.0010 in the name of Maybak

LLC, a company owned by Dauda. Dauda was the sole signor on the account. The account

application listed the business address at the same address as Dauda's Auto N Beyond.

183.    Maybak LLC was a domestic limited liability company registered in Alabama on

September 27, 2018, by Dauda with an address in Montgomery, Alabama.

184.    On March 1, 2019, MCU 259.0010 had a balance of $1,636 prior to receiving five

cash deposits totaling $44,900 during March 2019. Each deposit was under $10,000:

| Date | Amount |
|------|--------|
| 3/8/2019 | $8,600 |
| 3/9/2019 | $9,000 |
| 3/12/2019 | $9,000 |
| 3/13/2019 | $8,500 |
| 3/16/2019 | $9,800 |

185.    On March 20, 2019, $35,000 traceable to structured funds or funds involved in

structuring were wired from MCU 259.0010 in Alabama to Kickerillo's account in Texas toward

the purchase of the Defendant Property.

**4.  The $35,000 wired to Kickerillo on May 10, 2019, traces to structured
        funds or funds involved in structuring.**

186.    The $35,000 wire to Kickerillo's account on May 10, 2019, traces to structured

funds or funds involved in structuring.

187.    On April 1, 2019, MCU 259.0010 had a balance of $12,521 prior to receiving

nine cash deposits totaling $78,905 between April 2, 2019, and May 10, 2019. Each deposit was

under $10,000:

| Date | Amount |
|------|--------|
| 4/2/2019 | $5,805 |
| 4/3/2019 | $9,700 |
| 4/5/2019 | $8,000 |

| | |
|---|---|
| 4/8/2019 | $9,000 |
| 4/26/2019 | $9,500 |
| 4/27/2019 | $9,200 |
| 4/29/2019 | $8,500 |
| 5/8/2019 | $9,500 |
| 5/10/2019 | $9,700 |

188.     On May 10, 2019, Dauda wired $35,000 traceable to structured funds or funds involved in structuring from Maybak LLC's MCU 259.0010 in Alabama to Kickerillo's account in Texas toward the purchase of the Defendant Property.

### 5.   The $15,000 wired to Kickerillo on May 13, 2019, traces to structured funds or funds involved in structuring.

189.     Immediately following Dauda's May 10, 2019 wire to Kickerillo, Dauda deposited another $8,800 cash into Maybak LLC's MCU 259.0010 on May 13, 2019. Dauda then wired the same day, $15,000 traceable to structured funds or funds involved in structuring from MCU 259.0010 in Alabama to Kickerillo's account in Texas toward the purchase of the Defendant Property.

### D.   *Twenty-four Kickerillo payments totaling $995,892.75 are subject to forfeiture as property involved in money laundering.*

190.     The equity in the Defendant Property traceable to the remaining funds paid to Kickerillo for the Defendant Property's purchase is also subject to forfeiture because those funds were involved in the laundering of just over $750,000 in criminal proceeds used to purchase the Defendant Property. The remaining funds include:

### 1.   Boltimo International LLC Payments

i.   $6,000 wire from Boltimo International LLC's Capital One 3272 on December 13, 2018. Boltimo International LLC is a domestic limited liability company organized under the laws of New Jersey on or about July 1, 2014.

ii.   $4,000 wire from Boltimo International LLC's Atlantic Federal Credit Union
696.10 on December 14, 2018.

iii.  $40,400 wire from Boltimo International LLC's Atlantic Federal Credit Union
696.10 on May 29, 2019.

### 2.   Joella Global Concepts LLC Payments

i.    $35,000 wire from Archis Services' Capital One 5527 on February 20, 2019,
traceable to a check from Joella Global Concepts LLC. Archis Services was
registered on or about June 20, 2017, with an address in Humble, Texas. Joella
Global Concepts LLC is a Nigerian private unlimited company registered on
May 21, 2008, with an address in Nigeria. Joella Global Concepts LLC was also
registered in New Jersey on or about November 18, 2009.

ii.   $9,900 wire from Joella Global Concepts LLC's Wells Fargo 2195 on May 22,
2019.

iii.  $10,000 wire from Joella Global Concepts LLC's Wells Fargo 2195 on May 23,
2019.

iv.   $10,000 wire from Joella Global Concepts LLC's Wells Fargo 2195 on
September 25, 2019.

v.    $10,000 wire from Joella Global Concepts LLC's Wells Fargo 2195 on
September 26, 2019.

vi.   $20,000 wire from Ilembola A Adebowale's Wells Fargo 7691 on October 4,
2019, traceable in part to a check from Joella Global Concepts LLC.

vii. Amidst the structuring activity in Dauda's Auto N Beyond account—Compass 6624—that culminated with a $30,000 wire to Kickerillo on March 19, 2019, on March 12, 2019, the Auto N Beyond account was also used to wire $25,000 to Joella Global Concepts LLC's Wells Fargo 2195 account.

### 3. Arinze C. Ezebuilo Payments

i. $20,000 check from Arinze C Ezebuilo (Ezebuilo)'s Bank of America 2799 deposited in Kickerillo's account on March 20, 2019.

ii. $20,000 check from Ezebuilo's Bank of America 2799 deposited in Kickerillo's account on March 21, 2019.

iii. $9,000 check from Ezebuilo's Bank of America 2799 deposited in Kickerillo's account on August 30, 2019.

iv. $9,660.75 check from Ezebuilo's Bank of America 2799 deposited in Kickerillo's account on September 9, 2019.

### 4. United Bank of Africa Payments

i. $100,000 wire from United Bank of Africa on December 23, 2019.

ii. $100,000 wire from United Bank of Africa on January 17, 2020.

iii. $350,000 wire from United Bank of Africa on February 27, 2020.

### 5. Standard Charted Bank Nigeria Limited Payments

i. $50,000 wire from Standard Charted Bank Nigeria Limited on March 12, 2020.

ii. $50,000 wire from Standard Charted Bank Nigeria Limited on March 13, 2020.

iii. $32,200 wire from Standard Charted Bank Nigeria Limited on March 13, 2020.

iv. $38,745 wire from Standard Charted Bank Nigeria Limited on March 13, 2020.

v.  $29,055 wire from Standard Charted Bank Nigeria Limited on March 13, 2020.

**6.  Miscellaneous Payments**

i.  $6,800 check from Toduss LLC deposited in Kickerillo's account on May 29,

2020. Toduss LLC was a domestic limited liability company registered in Texas

on or about February 3, 2020, with an address in Frisco, Texas. Toduss LLC

was dissolved on or about August 11, 2021.

ii.  $10,132 cashier's check from Victor Emmanuel deposited in Kickerillo's

account on June 16, 2020.

iii.  $25,000 cashier's check from an account held by Nondera Services LLC and

deposited in Kickerillo's account on June 16, 2020. The memo line for the

check indicated: TELECOMS 4G. Nondera Services LLC was a domestic

limited liability company registered in Georgia on or about December 18, 2014,

with an address in Suwanee, Georgia.

**FIRST CAUSE OF ACTION**
18 U.S.C. § 981(a)(1)(C)
(Wire Fraud Forfeiture)

191.  The United States incorporates by reference herein all allegations previously

made.

192.  Under 18 U.S.C. § 981(a)(l)(C), any property, real or personal, which constitutes

or is derived from proceeds traceable to an offense constituting a "specified unlawful activity,"

or a conspiracy to commit such offense, is subject to forfeiture to the United States.

193.  Under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1), wire fraud in violation of 18

U.S.C. § 1343 is a specified unlawful activity.

194. Title 18, United States Code, Section 1343, provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice shall be guilty of a crime.

195. As described above, the Defendant Property was involved in one or more violations of 18 U.S.C. § 1343, or a conspiracy to do so. Fifteen of the Kickerillo Payments totaling $782,519.68 trace to wire fraud offenses.

196. Therefore, at least $782,519.68 plus attributable appreciation in the Defendant Property's equity is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C).

## SECOND CAUSE OF ACTION
### 18 U.S.C. § 981(a)(1)(C)
### (Structuring Forfeiture)

197. The United States reasserts all allegations previously made.

198. Under 31 U.S.C § 5317(c)(2) any property involved in a violation of 31 U.S.C. § 5324, and any property traceable to any such violation is subject to forfeiture.

199. As set forth above, the Defendant Property was involved in violations of 31 U.S.C. § 5324(a)(1) and (3) or is traceable to funds that were involved in such transactions. Five of the Kickerillo Payments totaling $130,000 trace to funds involved in illegal structuring.

200. Therefore, at least $130,000 plus attributable appreciation in the Defendant Property's equity is subject to forfeiture under 31 U.S.C. § 5317(c)(2).

**THIRD CAUSE OF ACTION**
18 U.S.C. § 981(a)(1)(A)
(Money Laundering Forfeiture)

201.    The United States reasserts all allegations previously made.

202.    Under 18 U.S.C. § 981(a)(1)(A) all property, real or personal, involved in a

transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to

such property is subject to forfeiture.

203.    Title 18, United States Code, Section 1956(a)(1)(B)(i), provides that:

> Whoever, knowing that the property involved in a financial transaction
> represents the proceeds of some form of unlawful activity, conducts or
> attempts to conduct such a financial transaction which in fact involves the
> proceeds of specified unlawful activity--(B) knowing that the transaction
> is designed in whole or in part--(i) to conceal or disguise the nature, the
> location, the source, the ownership, or the control of the proceeds of
> specified unlawful activity

204.    Wire Fraud in violation of 18 U.S.C. § 1343 is a specified unlawful activity under

18 USC §§ 1956(c)(7)(A) and 1961(1)(B).

205.    Structuring in violation of 31 U.S.C. § 5324(a)(1) and (3) is a specified unlawful

activity under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(E).

206.    As set forth above, the Defendant Property was involved in one or more financial

transactions that violated 18 U.S.C. § 1956. Specifically, the transactions engaged in to purchase

the Defendant Property detailed above were designed in whole or in part to conceal or disguise

the nature, the location, the source, the ownership, or the control of the proceeds from specified

unlawful activities (18 U.S.C. § 1343). All the Kickerillo Payments totaling $1,778,412.43 are

funds involved in money laundering.

207.    Therefore, the Defendant Property is subject to forfeiture in its entirety to the
United States under 18 U.S.C. § 981(a)(1)(A).

<h3 align="center">REQUEST FOR RELIEF</h3>

WHEREFORE, the United States respectfully asserts that the Defendant Property is
forfeitable to the United States under 18 U.S.C. §§ 981(a)(l)(A), (C) and 31 U.S.C. § 5317(c)(2).

The United States further requests:

A.    That, pursuant to 18 U.S.C. § 985(c)(1)(B), notice of this complaint be posted on
the Defendant Property.

B.    That Notice of this action be given to the property owner and all persons known
or thought to have an interest in or right against the Defendant Property;

C.    That a Judgment of Forfeiture be decreed against the Defendant Property
forfeiting all right, title, and interest in it to the United States;

D.    That upon the issuance of a Judgment of Forfeiture, the United States Marshals
Service or its delegate be able to dispose of the Defendant Property according to
law; and

E.    That the United States receives its costs of court and all further relief to which it is
entitled.

Dated this 21st day of December, 2023.

TRINA A. HIGGINS
United States Attorney

*/s/ Travis K. Elder*
TRAVIS K. ELDER
Assistant United States Attorney

46

## VERIFICATION

I, Special Agent Paul Drew Scown, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint *In Rem* and verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the factual statements contained therein are true and correct to the best of my knowledge and belief.

Executed on this ___19th___ day of December, 2023.

_____
Paul Drew Scown, Special Agent
Federal Bureau of Investigation

47

**ATTACHMENT A**

Payments to Kickerillo for Purchase of the Defendant Property

| Date | Amount | Type | Source Account | Account Owner |
|------|--------|------|----------------|---------------|
| 12/13/2018 | $6,000 | Wire | Capital One 3272 | Boltimo International LLC |
| 12/14/2018 | $4,000 | Wire | Atlantic Federal Credit Union 8696.10 | Boltimo International LLC |
| 2/20/2019 | $35,000 | Wire | Capital One 5527 | Archis Services |
| 2/20/2019 | $15,000 | Wire | Max Credit Union 690.0010 | Maybak LLC |
| 3/19/2019 | $30,000 | Wire | Compass Bank 6624 | Auto N Beyond |
| 3/20/2019 | $35,000 | Wire | Max Credit Union 259.0010 | Maybak LLC |
| 3/20/2019 | $20,000 | Check | Bank of America 2799 | Arinze C Ezebuilo |
| 3/21/2019 | $20,000 | Check | Bank of America 2799 | Arinze C Ezebuilo |
| 5/10/2019 | $35,000 | Wire | Max Credit Union 259.0010 | Maybak LLC |
| 5/13/2019 | $15,000 | Wire | Max Credit Union 259.0010 | Maybak LLC |
| 5/22/2019 | $9,900 | Wire | Wells Fargo 2195 | Joella Global Concepts, LLC |
| 5/23/2019 | $10,000 | Wire | Wells Fargo 2195 | Joella Global Concepts, LLC |
| 5/28/2019 | $10,000 | Wire | Wells Fargo 7829 | Jimmy Iwezu |
| 5/29/2019 | $36,981.34 | Wire | Bank of America 1639 | ETR Services, LLC |
| 5/29/2019 | $29,970.34 | Wire | JP Morgan Chase 1869 | RBE Solutions LLC |
| 8/30/2019 | $9,000 | Check | Bank of America 2799 | Arinze C Ezebuilo |
| 9/9/2019 | $9,660.75 | Check | Bank of America 2799 | Arinze C Ezebuilo |
| 9/25/2019 | $10,000 | Wire | Wells Fargo 2195 | Joella Global Concepts, LLC |
| 9/26/2019 | $10,000 | Wire | Wells Fargo 2195 | Joella Global Concepts, LLC |
| 10/4/2019 | $20,000 | Wire | Wells Fargo 7691 | Ilembola A Adebowale |

| Date | Amount | Type | Source Account | Account Owner |
|---|---|---|---|---|
| 12/23/2019 | $100,000 | Wire | United Bank for Africa | Unknown |
| 1/17/2020 | $100,000 | Wire | United Bank for Africa | Unknown |
| 2/27/2020 | $350,000 | Wire | United Bank for Africa | Unknown |
| 3/12/2020 | $50,000 | Wire | Standard Charted Bank Nigeria Limited | Unknown |
| 3/13/2020 | $50,000 | Wire | Standard Charted Bank Nigeria Limited | Unknown |
| 3/13/2020 | $32,200 | Wire | Standard Charted Bank Nigeria Limited | Unknown |
| 3/13/2020 | $38,745 | Wire | Standard Charted Bank Nigeria Limited | Unknown |
| 3/13/2020 | $29,055 | Wire | Standard Charted Bank Nigeria Limited | Unknown |
| 4/26/2020 | $42,500 | Cashier's Check | Bank of American 4227 | De Premium Entertainment LLC |
| 4/27/2020 | $53,200 | Cashier's Check | JP Morgan Chase 5891 | Martin Fritz |
| 5/29/2020 | $40,400 | Wire | Atlantic Federal Credit Union 8696.10 | Boltimo International LLC |
| 5/29/2020 | $6,800 | Check | Bank of America 0474 | Toduss LLC |
| 6/16/2020 | $31,000 | Cashier's Check | JP Morgan Chase 7352 | Willonrich Global Services LLC |
| 6/16/2020 | $25,000 | Cashier's Check | Woodforest National Bank 5457 | Nondera Services LLC |
| 6/16/2020 | $13,000 | Cashier's Check | Bank of America 8167 | Fidelo Gallery LLC |
| 6/16/2020 | $10,132 | Cashier's Check | JP Morgan Chase 6099 | Victor Emmanuel |
| 6/19/2020 | $150,000 | Cashier's Check | Bank of America 8877 | The Magnitude Development Group LLC |
| 6/24/2020 | $50,233 | Cashier's Check | Bank of America 4227 | De Premium Entertainment LLC |

| Date | Amount | Type | Source Account | Account Owner |
|---|---|---|---|---|
| 6/24/2020 | $50,000 | Cashier's Check | SunTrust 0062 | Sobana LLC |
| 6/24/2020 | $30,000 | Cashier's Check | JP Morgan Chase 0990 | Ephraim Ngala |
| 6/24/2020 | $27,000 | Cashier's Check | Bank of America 2830 | Vic & Lenny LLC—Bank of America 2830 |
| 6/26/2020 | $13,635 | Cashier's Check | Fifth Third Bank 1697 | Desheal N. Winfrey |
| 7/6/2020 | $55,000 | Cashier's Check | First IC Bank 5733 | AvJex Global LLC |
| 7/9/2020 | $60,000 | Cashier's Check | Wells Fargo 2026 | Vic & Lenny LLC—Bank of America 2830 |
| **TOTAL** | **$1,778,412.43** | | | |